UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| TAMIKA CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 15-373-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TOYOTA MOTOR MANUFACTURING, | ) | **MEMORANDUM OPINION** |
| KENTUCKY, INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Tamika Carter seeks damages from her employer, Defendant Toyota Motor Manufacturing, Kentucky, Inc. (TMMK), based on claims of race and gender discrimination under Title VII of the Civil Rights Act of 1964 and under the Kentucky Civil Rights Act. Carter alleges disparate treatment, retaliation, and a hostile work environment. Following discovery, the defendant moved for summary judgment, contending that Carter has not made the *prima facie* showing necessary to establish her claims. The Court agrees and will grant the relief sought.

## I. Background

As its name suggests, TMMK manufactures automobiles. [Record No. 32-1 at 2] It employs more than 9,000 full-time employees, dubbed "team members," and regularly operates two production shifts per day, five days a week, at its facility in Georgetown, Kenucky. [*Id.*] TMMK ostensibly operates pursuant to an "Equal Employment Opportunity & Promoting a Respectful Workplace" policy which is explained to each new team member

- 1 -

during his or her orientation and provided as part of a Team Member Handbook. [*Id.* at 3; Record No. 32-3 at 54-120]

Carter, an African-American female, began working at TMMK in September 2012 as a "Variable Workforce" team member employed through staffing agency Kelly Services, Inc. [Record No. 32-1 at 4]   Carter was formally hired by TMMK as a full-time production employee on December 16, 2013. [Record No. 4 at 2; Record No. 32-1 at 4]  Throughout her employment, Carter has consistently received positive performance reviews, either "meeting or exceeding expectations in all areas." [Record No. 32-1 at 4]   At some point during her employment, Carter applied to become a team leader. [Record No. 32-3 at 52 (Carter deposition at 286); Record No. 32-5 at 4-5 (Cooley deposition at 51-52)]  However, Carter voluntarily withdrew herself from the promotion process. [*Id.*]  Carter remains "employed in good standing" with TMMK. [*See* Record No. 32-1 at 1]

Notwithstanding her positive performance reviews, Carter alleges that she has been discriminated against "at an alarming rate" during her employment. [*See* Record No. 36 at 8] On that basis, she filed a charge with the EEOC in early 2015.[1]  Carter proceeded to file suit in this Court on December 17, 2015, along with an Amended Complaint on December 31, 2015. [Record Nos. 1, 4]  She alleges discrimination on the basis of her race and gender, that she was subjected to a hostile work environment, and that she was retaliated against for complaining to the Human Resources department and for filing a Charge of Discrimination

---

[1]     TMMK suggests that the charge was filed on March 19, 2015. [Record No. 32-1 at 4 n.2; 5 n.3; 8 n.10; 9 n.12; 15; 16]  Carter does not mention the date in her pleadings, but plaintiff's counsel asserted at the motion hearing that the charge was filed on January 19, 2015. [*See* Record No. 51.]

with the Equal Employment Opportunity Commission ("EEOC"). [Record No. 36 at 2] Carter seeks to enjoin the defendant from "continuing, threatened and future violations" of her rights as protected under Title VII; compensatory, consequential, and emotional distress damages; punitive damages under Title VII; costs, attorney's fees, and pre- and post-judgment interest on all sums recoverable; and all other relief the Court sees fit to grant. [Record No. 4 at 7] On February 19, 2016, a Scheduling Order was entered. [Record No. 12] Following the close of discovery, TMMK moved for summary judgment. [Record No. 32] Response and rely briefs were timely filed. [Record Nos. 36, 37] A motion hearing was held on January 9, 2017, [*see* Record No. 51] and the matter is now ripe for resolution.

Ironically, while Carter remains employed in "good standing," according to TMMK her tenure of employment "is best defined not by her performance, but by her complaints." [Record No. 32-1 at 1] TMMK suggests that Carter has complained about nearly every aspect of her employment, including "her supervisors, coworkers, assignments, training, training opportunities, advancement opportunities, and scheduling." [*Id.*] Most telling, they propose, is Carter's complaint to Human Resources "about a co-worker's decision to bring macaroni and cheese to a team member potluck meal after she (Carter) signed up to bring macaroni and cheese." [*Id.*; Record No. 32-2 at 17-18, 140] With that "backdrop," TMMK argues that Carter's civil rights claims are unfounded, that many claims are time barred, and that "what [Carter] did not (and could not) do was proffer any substantive evidence in support of her legal claims." [Record No. 32-1 at 1-2] During the motion hearing, counsel for the defendant stated succinctly "we do not know why we are here."

Carter strongly counters that, "[a]t the outset of her employment with Toyota" she was "subjected to racial discrimination that continued throughout the tenure of her employment." [Record No. 36 at 2]  Shortly after her hire date, she claims to have been "subjected to harassment based upon her race and gender."  [*Id.*]  Carter specifically alleges four types of job-duty related (non-verbal) discrimination and numerous instances of verbal discrimination.

### a.    Non-Verbal Discrimination

#### 1.    Denial of Offline Training[2]

Carter's primary complaint relates to the denial of what is known as "offline training." [Record No. 4 at ¶15; Record No. 36 at 2]  As a production employee, Carter works on a production line.  Offline training is training to work in the role of a team leader.  Team leaders do not work on the line directly, but instead support the line workers, including filling-in when a team member needs a restroom break.   "Offline training is for team members who are interested in becoming Team Leaders; basically, the team members learn how to fill-in for the Team Leaders."  [Record No. 32-1 at 6 n.6 (citing Carter deposition at 168-69); *see also* Record No. 36-2 at 2 (Cooley deposition at 29)]  Carter alleges that "[t]hroughout her employment, she consistently requested that she receive[] offline training to her Group Leader, Robert "Sean" Cooley; however, he consistently declined her requests."  [Record No. 36 at 2 (citing Cooley deposition at 27-28)]  Carter alleges in her Amended Complaint that she was denied offline training specifically on or about October 17, 2014.  [Record No. 4 at ¶ 19]

---

[2]    Carter does not allege the denial of offline training as gender-based discrimination. [Record No. 36 at 2 n.1]  She does, however, allege the denial of offline training as retaliation. [Record No. 36 at 10]

2.    Denial of Overtime[3]

Carter's second non-verbal complaint is the denial of overtime opportunities.  [Record No. 4 at ¶14; Record No. 36 at 2]  This allegation centers on opportunities to conduct what is known as "5S" cleaning.[4]  According to TMMK, 5S cleaning "is basically an expectation that team members devote 'down' time to tidying up their work areas."  [*Id.*]  However, on occasion, overtime was offered to conduct this task.  Carter alleges three instances of being denied overtime opportunities that were afforded to others.  [Record No. 36 at 2 (citing Carter deposition at 192)]  She contends that, "[o]n at least one occasion, Mr. Cooley told Carter that there was not available work for 5S cleaning when in fact there was work available, which was provided to the Caucasian Production Workers."  [Record No. 36 at 2 (citing Carter deposition at 193)]  Carter clams that, on another occasion, Group Leader Cooley announced that there was 5S cleaning overtime available following the conclusion of their shift that day and the next, but Cooley left before telling Carter where the work was specifically to be performed.  [Record No. 36 at 6 (citing Carter deposition at 203)]  Finally, Carter alleges that at least one Caucasian employee was allowed to begin his shift four-hours early, the extra hours counting as overtime, while she was not afforded that opportunity.  [Record No. 36 at 2 (citing Carter deposition at 196-97)]

---

[3]    As before, Carter does not allege the denial of overtime as gender-based discrimination, but does allege it as retaliation.  [Record No. 36 at 2 n.1, 10]

[4]    "5S" is an acronym for "Sifting, Sorting, Sweeping, Spick and Span, Standardize." [Record No. 32-1 at 6 n.8]  "Spick and Span" appear to count as a single "S."

3.      Defect Countermeasure Forms[5]

The third type of non-verbal discrimination Carter alleges relates to "countermeasure" or "CM" forms.  Per TMMK policy, CM forms are to be completed by team members anytime they are responsible for a defect on the production line.  [*See* Record No. 32-4 at 24-25 (Lance deposition at 67-68)]   Carter alleges that she was made to complete more defect countermeasure forms than Caucasian co-workers.   [Record No. 36 at 2 (citing Carter deposition at 127)]   In fact, she alleges that team leader Mike Johnson would cover up defects made by Caucasian Team Members to prevent them from having to complete CM forms. [Record No. 36 at 2 (citing Carter deposition at 141)]  Carter claims that she was chastised for a defect on October 24, 2014, but when two Caucasian employees had a "similar defect issue" a couple of days later, "Mr. Johnson covered up that defect and downplayed the significance of it."  [Record No. 4 at ¶20]  More defects, documented by CM forms, can be detrimental to an employee's performance reviews.  [*See* Record No. 36-2 at 2 (Cooley deposition at 28-29)]

4.      Parts-Loading Assignments

Finally, Carter alleges that she was assigned to parts-loading (apparently, a disfavored activity) more often than other employees.  [Record No. 4 at ¶¶15, 17]  Carter mentions in her Amended Complaint that she aired this concern to Human Resources employee Tiffany Lance in August 2014.  [*Id.*]

**b.      Verbal Discrimination**

---

[5]      Carter does not suggest that she dropped the defect countermeasure form claim as a basis for adverse employment action based on race.  However, because the alleged instance of this adverse treatment included a Caucasian female experiencing the same alleged disparate treatment, a race-based claim is questionable.  [*See* Record No. 36-1 at 12 (Carter deposition at 140-42).]

Carter alleges the following as verbal acts of discrimination:

- On February 2, 2014, co-worker Bruce Steele told Carter she received her job "because she was a black and a woman." [Record No. 4 at ¶13]

- Co-worker Dustin Allen called Carter "Raggedy Ann" due to the weave in her hair. [Record No. 36 at 3 (citing Carter deposition at 178)]

- Michael Johnson, a team lead, made jokes about Carter's hair extensions on or about August 7, 2014. [Record No. 4 ¶16; Record No. 36 at 3 (citing Carter deposition at 109)] "Mr. Johnson additionally made comments about Carter's hair and skin color, such as: 'I see you got your weave in today. You need a tan.'" [*Id.*]

- A co-worker "stated that Carter look (sic) like she was 48-years-old." [Record No. 4 ¶16]

- A co-worker "told Carter that if he put on black sleeves and black gloves, he would look like her." [Record No. 36 at 3 (citing Carter deposition at 190-91)]

- When Carter was performing manual line training in 2014, "Steve Edwards whispered to Chris Murphy and Dustin Allen to interrupt her training by purposefully harassing her and keep going to the restroom. Mr. Murphy and Mr. Allen would laugh, mock and make fun of Carter while she was being trained. Mr. Edwards told other employees to 'not listen to a damn word she says. She doesn't know what she is doing.' In addition, Wayne Conley called Carter a 'dumbass.'" [Record No. 4 at ¶ 24; Carter deposition at 194-95]

- Aaron Frank, a co-worker, told Carter, "[Y]ou are a woman, let me hear you roar." Mr. Frank additionally made jokes about Carter being a female when she made

mistakes in her work. [Record No. 4 at ¶25; Record No. 36 at 2 (citing Carter deposition at 67)]

- When Carter complained to her Group Leader/Supervisor Sean Cooley of Frank's "hear you roar" comment, Cooley "told Carter not be so sensitive and 'that's just how guys are.'" [Record No. 4 at ¶25; Record No. 36 at 2-3 (citing Carter deposition at 73)]

- Cooley additionally told Carter that she needed to "toughen up" and "stop being the victim." [Record No. 36 at 3 (citing Carter deposition at 82)]

- "After Carter lost some weight, a co-worker told her that the weight she lost 'ended up in her butt' and commented that she was 'pear shaped.'" [Record No. 36 at 3 (citing Carter deposition at 109)]

- "On a day where Carter dressed up a little more than usual, a co-worker asked her if she came to work to look for a man." [Record No. 36 at 3 (citing Carter deposition at 134)]

- "After Carter made complaints to Toyota's Human Resources Department and filed a Charge of Discrimination, her supervisors and co-workers began to refer to Carter as the 'HR queen.'" [Record No. 36 at 3 (citing Carter deposition at 113-14)].

- "Throughout her employment, Carter was called an 'HR queen' by [Mike] Johnson and [Bruce] Steele. [Mike] Johnson additionally posted online that Carter was a 'victim.'" [Record No. 4 at ¶28]

- "Carter's co-workers would warn current and new employees to not say anything to her or around her because she would go to the Human Resources department." [Record No. 36 at 3 (citing Carter deposition at 156)].

- "Mr. Cooley [] concocted a plan to get Carter in trouble by telling one of Carter's co-worker's to yell 'stop harassing me' to Carter." [Record No. 36 at 3 (citing Carter deposition at 155-56)]

- "Throughout her employment, Carter was mocked by [Mike] Johnson and [Bruce] Steele for having dark skin and hair extensions." [Record No. 4 at ¶27]

## II. Discussion

The evidence is viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment under Rule 56. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Therefore, the central question at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251.

However, "the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Moreover, the "mere existence of *some* alleged factual dispute between the parties" is not sufficient to defeat an otherwise properly supported motion. *Id.* (quoting *Anderson,* 477 U.S. at 247-48 (emphasis in original)). There must instead be a dispute as to a

"*genuine* issue of *material* fact," such that if proven at trial "a reasonable jury could return a verdict for the nonmoving party." *Id.* TMMK argues that it easily meets the summary judgment burden because Carter did not, and cannot, proffer any substantive evidence in support of her legal claims. [Record No. 32-1 at 2]

### a. Statute of Limitations

The defendant argues as an initial matter that a number of the instances cited as supporting Carter's claim are time-barred because they occurred more than 300 days prior to her charge being filed with the Equal Employment Opportunity Commission.

> Carter alleges a number of minor incidents which are appropriate for summary judgment under well-established Sixth Circuit law. The Court, however, need only consider some of her allegations, as several of her complaints are untimely. Title VII requires a charge alleging discrimination or harassment be made within 300-days of the alleged discriminatory/harassing conduct to be considered timely. *See* 29 C.F.R. § 1601.13(a)(4)(ii)(A); "the relevant administrative regulation provides that a charge is 'deemed to be filed with the Commission upon receipt' and is timely if '**received** within 300 days from the date of the alleged violation" (emphasis in original). Carter's EEOC Charge was filed on March 19, 2015. Thus, only allegations of conduct occurring within 300-days of when her Charge was filed (May 10, 2014 forward) are timely.

[Record No. 32-1 at 16] While a correct statement of the law for Title VII purposes, the defendant's assertion that the Court need not consider all of the alleged conduct is incorrect. The Kentucky Civil Rights Act ("KCRA"), codified at KY. REV. STAT. § 344.010, *et seq.*, contains a five-year statute of limitations. KY. REV. STAT. § 413.120(2); *see Effinger v. Philip Morris, Inc.*, 984 F. Supp. 1043, 1047 (W.D. Ky. 1997) (citing *Clifton v. Midway College,* 702 S.W.2d 835, 837 (Ky. 1985) (discussing statute of limitations)); *Jones v. Peabody Coal Co.*, No. 88-0065-0(CS), 1989 WL 225719, at *5 (W.D. Ky. Nov. 1, 1989) ("[T]he five-year statute of limitations [under K.R.S. § 413.120(2)] applies to the Kentucky Civil Rights Act.").

Liability under the Act mirrors federal law. Specifically, "Kentucky courts look to federal law in interpreting the Kentucky Civil Rights Act." *Woodrum v. Lane Bryant The Limited, Inc.*, 964 F. Supp. 243, 244 (W.D. Ky. 1997). "[T]he policy of the Kentucky Civil Rights Act is: 'To provide for execution within the state of the policies embodied in the Federal Civil Rights Act of 1964 . . . and the Civil Rights Act of 1991.'" *Id.* (citing KRS 344.020(1)(a)); *Gafford v. General Elec. Co.,* 997 F.2d 150, 166 (6th Cir. 1993) ("Kentucky courts have followed federal law in interpreting the Kentucky statute"). For purposes of the Rule 56 analysis, there is no basis for distinguishing between the KCRA and Title VII. Moreover, because the present suit was filed less than 5 years after Carter began working for TMMK, the statute of limitations is not at issue.

### b.      Discrimination/Disparate Treatment Claim

"[Title VII's] antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800-801 (1973)). Carter alleges discrimination based on both race and gender. The burden of proof is the same regarding each claim. "To prove a *prima facie* case of gender discrimination a plaintiff must prove: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the same time her request for promotion was denied." *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (applying same standard

for race-based claim). Upon the plaintiff establishing a *prima facie* case, "[t]he burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for promoting the other employee." *Warf*, 713 F.3d at 879 (citing *McDonnell Douglas,* 411 U.S. at 802). Under the *McDonnell Douglas* burden-shifting framework, "[o]nce the employer has provided a nondiscriminatory reason for its actions the burden shifts back to the employee to show that the reason is pretext for discrimination." *Id.*

While often stated in terms of a promotion, this standard applies to any disparate treatment that constitutes adverse employment action. "An adverse employment action in the context of a Title VII discrimination claim is a 'materially adverse change in the terms or conditions of employment because of the employer's actions.'" *Michael*, 496 F.3d at 593 (citing *Allen v. Michigan Dept. of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999)). Moreover,

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Ford v. General Motors Corp.,* 305 F.3d 545, 553 (6th Cir. 2002).

Carter asserts that she meets this test. She claims to have "suffered an adverse employment action when she was denied opportunities for offline training and voluntary overtime, which resulted in a significant loss of income." [Record No. 36 at 5] Moreover, "Toyota's failure to provide Carter with offline training kept her from gaining the knowledge to further herself within Toyota . . . [and] Toyota's actions in requiring her to complete defect countermeasure forms more frequently than her Caucasian co-workers additionally kept her

from furthering herself within Toyota because defect countermeasure documents are reflected negatively upon the employee." [*Id.*] It is undisputed that Carter is a member of a protected class. Therefore, her burden is to show materially adverse changes that she suffered but that similarly-situated non-protected-class co-workers did not suffer.

1. Offline Training

Carter contends that she consistently was denied offline training, despite the supposed practice of TMMK to provide offline training to any employee who requested it. [Record No. 36 at 6] She claims that her supervisor, Sean Cooley "would deny [her] requests citing that she 'wasn't ready.'" [*Id.* (citing Cooley deposition at 27-28)] Carter cites the deposition of her co-worker Bruce Steele to establish that "it was normal procedure that a Team Member will receive offline training if they want it." [*Id.* (citing Steele deposition at 17)] Moreover, Carter cites Steele's testimony as establishing that "he received offline manual training upon his request, and that he was aware of other Team Members who were trained upon their requests as well." [*Id.*]

In reality, Carter has not offered evidence through the testimony referenced (or otherwise) that it *is* or *was* the policy of TMMK to provide offline training to employees each time an employee requested it. Bruce Steel did not testify that he received offline training *every* time he requested. On the contrary, Steele testified that he *too* had been denied offline training.[6] He explained that there are factors that go into the decision, such as the seniority of

---

[6]
    Q  Okay. And did you receive training every time you requested to be trained?
    A  Every time?
    Q  Yes.
    A  No.
    Q  Okay. Do you recall specific instances where you were denied training?

the requestor. [Record No. 36-3 at 2 (Steele deposition at 16-17)] This is consistent with Sean Cooley's testimony regarding the offline training schedule. [Record No. 36-2 at 2 (Cooley deposition at 27-28)]

While Carter suggests she was "consistently" denied offline training, she does not elaborate on how many times she was denied such training, and she does not allege that co-workers of less seniority received offline training more often than, or prior to, her receiving it. It is Carter's responsibility to "come forward with some probative evidence to support [her] claim." *Lansing Dairy*, 39 F.3d at 1347. Without evidence of a "genuine issue of material fact," there is not a sufficient basis for a jury to find in her favor. *Id.*

Carter fails to provide any probative evidence that would support a jury finding in her favor. It is not disputed that Carter was at one point or another denied offline training. [*See* Record No. 36-1 at 17 (Carter deposition at 194).] But even if she were "consistently" denied offline training, it would not be actionable if she were denied in favor of those with seniority (assuming lack of pretext). Cooley acknowledges in his deposition that Carter came to him "on numerous occasions" requesting offline training. [Record No. 36-2 at 2 (Cooley deposition at 27)] However, his testimony states only that he denied Carter offline training the *first* time she approached him to ask. [*Id.* (Cooley deposition at 28)]. And she was denied

---

A Yes.
Q Okay. Tell me about those.
A Because somebody else wanted to be trained. So if [Bryan] Hart or Tamika wanted to be trained, they were trained instead of me. [Record No. 36-3 at 2 (Steele deposition at 16)]

because "she wasn't ready - - from a performance standpoint." [*Id.* (Cooley deposition at 28-29)].[7]

Therefore, even assuming Carter has made a *prima facie* case, TMMK has met its burden of showing a non-discriminatory reason for not providing the offline training—she was too new to the job and had not proven herself (performance-wise) to be ready for more responsibility. Carter has not suggested, argued, or otherwise shown, that this explanation is pretextual. This claim fails because Carter has not met her burden under *McDonnell Douglas*.

Implicit in the preceding analysis is that the denial of offline training is itself a materially-adverse change in the terms and conditions of employment. To independently support this assumption, plaintiff's counsel suggested during the hearing that Carter's lack of offline training resulted in her inability to become a team leader in October 2014.[8] This allegation is not otherwise made in the pleadings or in Carter's Response, and is not supported by any record evidence. At some point, Carter did apply to become a team leader, but voluntarily withdrew herself from consideration. [Record No. 32-1 at 14 (citing Carter

---

[7]    TMMK notes in its reply:

At the time Carter first made her request [for offline training], she was "still having some defects" and "wasn't completing [her job] process[es] quite on time." Carter was also "stopping the [production] line so much that [it was] starting to affect [the] productivity of the whole line." (Cooley Dep., pp. 28-29). It was this learning curve (which many new team members experience), not Carter's race, that caused Cooley to conclude she was not ready to perform Team Leader duties.

[Record No. 37 at 2]

[8]    Counsel stated, without elaboration, that Carter was not able to become a team leader in 2014 "because she was denied offline training."

deposition at 233, 286; Cooley deposition at 51-52)]  The plaintiff has not provided a timeline of events, but the deposition testimony does not suggest that this withdrawal from consideration was the result of, or somehow mandated by, her lack of offline training.

It bears noting that while Cooley initially told Carter that she "wasn't ready" for offline training (and by inference, to become a team leader), that changed.  Cooley eventually *encouraged* Carter to pursue a team leader position, and completed the necessary paperwork for her to do so.  [Record No. 32-1 at 14]  Given Carter's voluntary withdrawal from consideration for a team leader position, her preceding claims ring more hollow.

Seeking to remove any doubt of this claim's futility, TMMK points out that individuals promoted to team leader during Carter's tenure all had greater seniority than the seniority Carter possessed.  "While Carter testified there had been several White males promoted to Team Leader positions in the Powertrain Department, she admitted they all were in the Powertrain Department at the time Toyota hired her (Carter Dep., p. 135) and had greater Departmental seniority.  Simply put, none of them were similarly-situated to Carter."  [Record No. 32-1 at 15]

Finally, while the Court again assumes that a denial of offline training is material in and of itself, the defendant rightly notes that, in the usual case, without applying for a position, a plaintiff cannot make a *prima facie* claim of adverse employment action.  [Record No. 32-1 at 14]  The third prong requires that the plaintiff applied for the position sought.  *See Hall v. Michigan State Police*, 290 F. App'x 913 (6th Cir. 2008)

       2.       Overtime

As explained in her response:

Carter testified at her deposition that she would ask Mr. Cooley if there was any available work for 5S cleaning on Saturdays, and he would reply "no," but she would later find out that her co-workers were allowed to conduct 5S cleaning. [Record No. 36-1 (Carter deposition at 192-93)]. Carter also testified that she was not afforded any voluntary overtime in comparison to her Caucasian coworkers, such as Bruce Steele. *Id.* at 196. Specifically, on October 20, 2015, Mr. Cooley advised the employees that there would be overtime for 5S training that day and the next. *Id.* at 203. Carter went to locate Mr. Cooley at the end of her shift to begin 5S cleaning, but he had already left the building. *Id.* Thereafter, Carter became aware that some employees were allowed to conduct 5S cleaning that day. *Id.*

[Record No. 36 at 6]

This circuit has recognized, though not formally, that the denial of overtime may constitute adverse employment action. *Broska v. Henderson*, 70 F. App'x 262, 267 (6th Cir. 2003) (citing *Montgomery v. Honda of Am. Mfg., Inc.,* 47 F. App'x. 342 (6th Cir. 2002)). However, the Sixth Circuit has not been shy to deny such claims where sufficient evidence is lacking.

While we again stress that allegations of a denial of overtime, properly supported, could constitute an adverse employment action, Broska has put forth virtually no evidence on the overtime issue. In fact, we find this case to be very similar to *Montgomery* in that regard. Like the plaintiff in *Montgomery,* Broska has not presented evidence showing that he has been denied overtime opportunities that others have received. *Broska has not even stated how much overtime he lost due to the retaliation.* The only evidence that Broska has adduced is his own terse statement in his affidavit that the Post Office diminished "my work responsibilities in the sorting of my business mail," which caused him to lose overtime "in excess of $16,000." We find this insufficient to withstand the defendants' motion for summary judgment.

*Id.* at 268 (internal citation omitted; emphasis added). This case suffers from the same flaw. But unlike *Broska*, Carter has not so much as alleged a dollar loss resulting from her alleged denial of overtime.

Carter alleges that on three occasions she did not receive overtime that others were afforded. But during her deposition, the only specific instance she describes occurred on October 20, 2015. [*See* Record No. 37 at 4] On that occasion, Carter alleges that her supervisor, Sean Cooley, announced that there was 5S-cleaning overtime available following the conclusion of their shift that day and the next, but Cooley left before telling Carter where the work was to be performed. [Record No. 36 at 6 (citing Carter deposition at 203)] It is far from clear that the Cooley's mere departure for the day without speaking to Carter evidences animus towards Carter, much less animus on account of her race. Carter does not claim that Cooley intentionally avoided her, or that she was the only employee who wanted overtime on that occasion but was unable to work it because Cooley allegedly did not make a point of speaking to her individually before he left for the day. There is no suggestion or evidence to establish that Cooley had an obligation to speak with Carter before he left, or that he knew that Carter wished to speak with him but left regardless. Carter makes no allegation that Cooley *intended to* prohibit her from receiving overtime on this occasion. To establish a *prima facie* case, something more would be required, such as evidence to corroborate that other individuals actually worked overtime on the date(s) Carter did not.

Requiring some (or any) corroborating evidence is a low bar. If Carter's co-workers were permitted overtime on days when she was not given that opportunity, there would be time records to reflect this fact. Carter admits that an employee's overtime would be recorded as an electronic record. [Record No. 36-1 at 17 (Carter deposition at 193)] However, despite complete discovery -- and the lack of any discovery disputes -- Carter has failed to offer any evidence, or shown by deposition or affidavit that any co-workers, much less those of non-

protected status, worked overtime on days that she was denied. She makes no allegation of the hours or earnings lost (seriously imperiling a jury's ability to calculate compensatory damages). The utter lack of evidence is fatal to her claim, especially given Carter's admission that she *has* been afforded some voluntary overtime. [Record No. 36-1 at 18 (Carter deposition at 196-97)] As in *Broska* and *Montgomery*, Carter's bare allegations are insufficient to survive summary judgment.

### 3. Countermeasure Forms

Carter points to testimony in her deposition that "she received more countermeasure documents than anyone else in her group" and that she was made to complete more defect countermeasure documents than her Caucasian co-workers." [Record No. 36 at 2, 6 (citing Carter deposition at 127)] She also alleges that team leader Mike Johnson "covered up defects for Steve Edwards, Caucasian, and Bryan Hart, Caucasian." [Record No. 36 at 6 (citing Carter deposition at 141)] This allegation suffers from two fatal flaws. First, TMMK policy requires CM forms be completed by team members anytime they are responsible for a defect on the production line. [*See* Record No. 32-4 at 24-25 (Lance deposition at 67-68)] Therefore, being required to fill out countermeasure forms, alone, cannot constitute adverse employment action. Carter's allegation that she received more CM forms than her Caucasian co-workers is irrelevant if she "received more CM forms than anyone else in her group" because she, in fact, had more defects. But Carter does not specify. Assuming that this is what Carter means (i.e., that she was made to fill out more CM forms *per defect* than her co-workers and in violation of TMMK policy), she provides no evidence, including testimony, to support this claim. Carter provides one specific example—that team

leader Mike Johnson "covered up" defects for two Caucasian co-workers. The specifics of this allegation render it meaningless. First, Carter alleges that she and Amy Simon, a Caucasian female, were both being blamed for the defect while the male-coworkers' roles were being covered-up. [Record No. 36-1 at 12 (Carter deposition at 140-42)] This instance, on its face, does not support Carter's claim that she was treated disproportionately to Caucasian team members. Second, Carter admits that, in fact, all four individuals were made to fill out CM forms after the incident: "All four of us sat there; myself, Amy Simon, Steve Edwards and Bryan [Hart]." [*Id.* (Carter deposition at 142)]

Carter provides no other examples, and does not specifically allege sex-based discrimination on the basis of CM forms. In the end, CM forms are vital business records, and Carter has failed to reference or provided any statistical evidence whatsoever regarding the frequency with which she and her co-workers completed CM forms. It is true that CM forms matter. Testimony presented suggests that CM forms may prevent a team member from receiving offline training, and ultimately delay or inhibit one's ability for job advancement. This is only natural because CM forms denote production defects, and production defects are bad for business. However, at the very least, Carter should be able to obtain evidence beyond her own assertion that she completed more defect CM forms than anyone else on her team. With a *zero* documentary showing, there is insufficient evidence for a jury finding in her favor.

4.      Parts-Loading

Carter alleges in her Amended Complaint that she was assigned the task of "parts-loading" more often than other employees. [Record No. 4 at ¶¶15, 17] While she apparently aired this concern to Human Resources employee Tiffany Lance in August 2014, [*Id.*], there

is nothing referenced on this point in Carter's Response. Carter's deposition testimony suggests that team leader Mike Johnson made "excuses" for why co-worker Bryan Hart was not required to perform parts-loading after he had been training offline, as was customary. [Record No. 36-1 at 16 (Carter deposition at 190)] Carter's suggestion that Johnson "usually" skips the person for this duty, even if taken as true, is insufficient to establish the allegation made in the amended complaint: that is, that she was assigned the task more often than others.

5.      Delayed Hiring by TMMK

A fifth (potential) claim, not discussed above, is mentioned solely by the defendant. According to TMMK, Carter claims that Sean Cooley "held" her "hiring packet," which had the effect of delaying the date on which she became an actual TMMK employee. [Record No. 32-1 at 4 n.2] TMMK provides an excerpt of Carter's deposition testimony on this point. [Record No. 32-3 at 48-49 (Carter deposition at 215-16)] Assuming that Carter intends to assert this claim, there is no suggestion that Carter's hire date was delayed longer than other similarly-situated individuals. In fact, there is no suggestion at all that she was treated differently than anyone in being hired from Kelly Services, the staffing agency. Carter does not make this allegation in her Amended Complaint or in her response. Therefore, given the lack of any argument in support of the claim, and an apparent absence of any suggestion of disparate treatment, this claim necessarily fails.

Having considered all of Carter's disparate treatment claims, the Court finds that the plaintiff has consistently failed to establish a *prima facie* case or, where relevant, has failed to rebut TMMK's proffered non-discriminatory reasons for the actions alleged. Without a

genuine issue of material fact, the defendant is entitled to summary judgment on Carter's disparate treatment claim.

### c.    Hostile Work Environment Claim

"A hostile work environment claim requires proof that (1) plaintiff belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 2017 WL 1337236 at *3 (6th Cir. 2017). The same standard applies for harassment based on gender. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

The fourth prong of the test, "whether harassment was so severe and pervasive as to constitute a hostile work environment," is "quintessentially a question of fact." *Smith*, 813 F.3d at 310 (quoting *Jordan v. City of Cleveland,* 464 F.3d 584, 597 (6th Cir. 2006)). However, as "decades of precedent" recognize, courts retain the authority at the summary judgment stage to "determine that offensive conduct is not severe or pervasive enough to constitute a hostile work environment." *Phillips*, 854 F.3d 323, 2017 WL 1337236 at *3 n.4 (6th Cir. 2017) (listing cases). That is, "[courts] continue to apply 'standards for judging hostility [that] are sufficiently demanding to ensure that Title VII does not become a general civility code.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the

circumstances,[9] which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also, Barrett* 556 F.3d at 515 (citing *Harris* for a "totality of the circumstances" test); *Thornton v. Fed. Express Corp.,* 530 F.3d 451, 455 (6th Cir. 2008) (same). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher*, 524 U.S. at 788. "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment." *Id.*

With respect to the fifth prong of the test, "[t]o establish employer liability where the harasser is a co-worker, a plaintiff must show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016). On the other hand, "employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). Nonetheless, "an employer can raise an affirmative defense to liability for supervisor harassment by establishing: (1) that it exercised reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor, and (2) that the plaintiff

---

[9]     "[D]istrict courts must not conduct separate analyses based on the identity of the harasser unless and until considering employer liability." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562-63 (6th Cir. 1999).

employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the harm." *Id.*

As an African-American, and as a female, Carter is a member of a protected class. Taking her allegations as true, with some corroborated by other evidence, she meets the second and third prongs of the test—that she was subject to unwelcome harassment, and that it was based on her protected status.[10]  However, considering the circumstances as a whole, Carter has not established that the comments were severe or pervasive enough to be actionable.  As stated above, the conduct must be "extreme" to "amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.  While many of the comments alleged are offensive, they can hardly be said to be independently severe.  "To succeed, a plaintiff must show that the work environment was both subjectively and objectively hostile; in other words, that the plaintiff not only perceived the work environment as hostile, but that a reasonable person would have found it hostile or abusive as well."  *Rock-Tenn*, 813 F.3d at 309 (citing *Harris*, 510 U.S. at 21).

To pick an egregious example, the suggestion that Carter received her job "because she was black and a woman" is highly offensive.  But while egregious, it is hardly "extreme" harassment.  By way of comparison, in *Williams v. CSX Transp. Co.*, 643 F.3d 502 (6th Cir. 2011), the Sixth Circuit found a supervisor's comment calling Jesse Jackson and Al Sharpton "monkeys" and "saying that black people should 'go back to where [they] came from'" to be "insensitive, ignorant, and bigoted," but "not sufficiently "severe" or "pervasive" standing

---

[10]     The alleged comment "you look like a 48-year-old" is ambiguous and of no substantive import given that Carter has not alleged age-based discrimination.

alone to create a jury question on [the plaintiff's] racially hostile work environment claim." 643 F.3d at 513. The Court found the comments to "more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.'" *Id.* It is hard to see how the alleged comment to Carter (insinuating that she was not individually qualified but received her position only because of her race and sex) is more humiliating than a comment debasing an entire race.

To be sure, the comments here were directed at Carter *personally*, rather towards a racial group generally, but they are at most equally non-severe on the records as a whole. To that end, other comments, outlined in detail above, include references to Carter "having her weave in today," being called "Raggedy Ann" because of her hair,[11] being told "you need a tan," the suggestion that if a co-worker would put on black sleeves and black gloves he would "look like her," being told she was "pear shaped" and her weight "ended up in her butt," asking her if she "came to work to look for a man," being told to "toughen up" and "don't be so sensitive," and being called an "H.R. queen." The other comments amount to petty insults, and are not suggestive of pervasive harassment. TMMK points to evidence in the record that Carter herself engaged in such petty slights.[12] Indeed, "[t]he shop floor is a rough and

---

[11]    TMMK asserts that comments or policies based on hair-styles are not actionable under Title VII because they are no immutable characteristics. [*See* Record No. 37 at 7 n.4 (citing cases)]

[12]    One of Carter's co-workers, Bruce Steele (White), testified Carter made fun of a male co-worker with a lazy eye, calling him "crooked eye." She also called other co-workers "fat" and "trailer trash," and teased yet another coworker about his wife cheating on him and had a baby by another man while the two were still married (Deposition of Bruce Steele, hereafter "Steele Dep.," pp. 19-20; cited portions of Steele's deposition are attached hereto Tab F). Steele further testified Carter "voiced concerns" about comments allegedly made to her, but

indelicate environment in which finishing school manners are not the behavioral norm." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 570–71 (6th Cir. 1999) (Ryan, J., concurring in part and dissenting in part)

Even assuming that Carter has established the severity prong, she fails to establish employer liability. The comments in *Williams* were made by supervisors, while the vast majority of comments here were made by coworkers. For harassment by a co-worker, Carter must show that TMMK "knew or should have known of the conduct and failed to take prompt and appropriate corrective action." *Rock-Tenn,* 813 F.3d at 307. Carter has made not such showing and, in her response, does not attempt to do so. Crucially, TMMK thoroughly investigated each and every allegation that Carter made, even those to which Carter did not take personal offense.[13] And where they could substantiate the comments, corrective action was taken.[14] Carter does not contravene TMMK's assertion that it fully investigated, and took

---

"only after she had made inappropriate comments to somebody else" (Steele Dep., p. 21).

[Record No. 32-1 at 8 n.11]

[13]    TMMK fully summarizes its investigation, and notes corrective action for substantiated comments. [Record No. 32-1 at 7-12]

[14]    For example, a variable workforce employee received a "Final Warning" for recounting a racially-motivated comment made on television by a UK basketball player. [Record No. 32-1 at 11] A TMMK team member received a "Documented Coaching" for a racially-motivated joke. [*Id.* at 12] Dustin Allen, though he denied calling Carter "Raggedy Ann," was reminded that "such comments, if made, would be considered by Toyota to be inappropriate in the workplace, and could subject him to corrective action, up to and including termination." [*Id.* at 12 n.17]

corrective action where necessary. Instead, Carter points out that some of the harassing comments were made by supervisor.

While Carter does not specify, the only supervisor identified is Sean Cooley. Cooley's alleged offensive acts are as follows. First, in response to another employee's "hear you roar" comment, Cooley "told Carter not to be so sensitive and 'that's just how guys are.'" [Record No. 4 at ¶25; Record No. 36 at 2-3 (citing Carter deposition at 73)] Second, Cooley suggested to Carter that she "toughen up," and "stop being the victim." [Record No. 36 at 3 (citing Carter deposition at 82)] Finally, Cooley "concocted a plan to get Carter in trouble by telling one of [her] co-worker's to yell 'stop harassing me' to Carter." [Record No. 36 at 3 (citing Carter deposition at 155-56)]

Cooley admitted that he suggested to Carter that she should "toughen up." However, he explained that he was trying to help Carter, because, like his two daughters, he did not want them to feel like victims, but to take charge. [Record No. 32-5 at 6 (Cooley deposition at 55)] Cooley was reprimanded by TMMK for making this comment, and later apologized to Carter.[15]

---

[15] According to the notes of H.R. Employee Tiffany Lance:

> I told [Cooley] at that time that I would use this time to coach him on the fact that making a comment like that to a female is insinuating that she IS in fact a victim and that she IS in fact weak in some way. He again stated that he was only trying to help her and that he knows she's had some issues in her personal life and he only wanted to help. I told him that it was not his responsibility to help her in her personal life or to give her life advice. He is not her father, her husband, her brother … He is her supervisor at work and that he should not cross the line of professionalism when speaking to or dealing with any of his TM's. I reiterated to him that saying what he said to a female can be taken as offensive and negative and that he should never say that to another female TM or to any TM for that matter.
> …

These alleged comments by Cooley are hardly severe or pervasive enough to be actionable under Title VII or the KCRA. Moreover, because Carter does not allege a tangible employment action that resulted, and given Carter's recorded satisfaction with TMMK's resolution of Cooley's statements of this nature, TMMK would be entitled to an affirmative defense.

Carter's third allegation that Cooley attempted to get her in trouble is certainly troubling. Unfortunately, like many of her other claims, Carter provides no competent evidence to corroborate this assertion. The allegation again involves Amy Simon. [*See* Record No. 36-1 at 14 (Carter deposition at 155-56).] Simon, a Caucasian female, allegedly told Carter that she was "made to treat [her poorly]." [*Id.*] Carter provides no deposition testimony, affidavit, or other evidence from Simon or anyone to corroborate this allegation. Here again, Carter's own testimony is not sufficient to support the claim.

While Carter make various other allegations against her team leader Mike Johnson, she does not actually argue that Johnson was a "supervisor" for Title VII purposes, and the record does not otherwise support such a conclusion.[16] As an initial matter, team leaders are not

---

I went back to Tamika a few weeks later and asked her if she was doing okay and to let her know that I addressed the situation with Sean. Tamika stated to me that Sean did apologize to her and that things were going well. I told her to let me know if she has any more issues.

[Record No. 32-2 at 132-33]

[16] Carter alleges that "[a]fter [she] made complaints to Toyota's Human Resources Department and filed a Charge of Discrimination, her *supervisors* and co-workers began to refer to Carter as the 'HR queen.'" [Record No. 36 at 3 (citing Carter deposition at 113-14)]. "Carter's *supervisors* and coworkers would refer to her as the "HR queen" and would warn new employees to be careful what they say around Carter as she will go to the Human Resources department." [Record No. 36 at 8] Carter's own statements, including her

classified as supervisors by TMMK.[17]  Further, under prevailing caselaw, "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim[.]"  *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013); *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 956 (6th Cir. 2014) (applying *Vance* standard).  More specifically,

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Vance*, 133 S.Ct. at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

There is nothing in the record to suggest that Mike Johnson was empowered to take tangible employment actions against Carter.  Cooley, rather than Johnson, was responsible for Carter's performance evaluations, was tasked with assigning offline training, and was responsible for assigning overtime.  Likewise Cooley, rather than Johnson, was responsible for providing a recommendation to *become* a team leader.  Team leaders are tasked with supporting line workers, such as providing restroom breaks when needed.  Nothing in the record suggests that

---

deposition and TMMK's internal H.R. transcript, suggest only that Bruce Steele and Mike Johnson refereed to Carter as an "H.R. Queen."  [Record No. 32-3 at 135 ("HR: So, who's referred to you as the HR Queen?  TAMIKA: Bruce and Mike"); Record No. 36-1 at 8 (Carter deposition at 114)]  Therefore, there is no recorded allegation that Sean Cooley called Carter an "H.R. queen," but Carter's pleadings appear to presume that Johnson is a supervisor.

[17]  TMMK made this point clear during the January 9, 2017, hearing.  *See also, e.g.,* TMMK Team Member Handbook [Record No. 32-3 at 54-120 (using "Group Leader" and "Supervisor" interchangeably); *Id.* at 62 (listing "Team Leader" as separate and beneath "Group Leader/Supervisor")]; TMMK Evaluation Period Forms [Record No. 32-3 at 121-31 (using "Group Leader" and "Supervisor" interchangeably)].

they may effect a significant change in a team member's employment status, the least of which would be to reassign a team members with significantly different responsibilities. Therefore, TMMK cannot be vicariously liable for the actions of Mike Johnson.

But even if Johnson was a supervisor, Carter has not shown a tangible employment action based upon her being called an "H.R. queen." Therefore, TMMK would be entitled to an affirmative defense because it has taken reasonable precautions to prevent such harassment, and Carter has put forth no evidence showing that the comments persisted despite her taking advantage of the preventive or corrective opportunities provided by TMMK. While the record reflects that Carter reported the comments to TMMK [*see* Record No. 32-3 at 135], TMMK investigated the complaint [*see* Record No. 32-1 at 10] and Carter has not further alleged that the comments persisted past the date of the complaint.

Carter's denial of offline training, denial of overtime, disproportionate defect countermeasure forms, and disproportionate parts loading claims could all count for purposes of a hostile work environment. However, given the above-discussed lack of evidence to support Carter's claim that these actions, if done at all, were based on Carter's protected status, they necessarily fail for a hostile work environment claim.

Finally, Carter alleges in her deposition that she decided not to go forward with team leader training because she was unable to earn her coworkers' respect. This argument is compelling. But to be actionable, it must be the result of prohibited conduct—harassment based on race or sex. Taken as a whole, the record supports that Carter had trouble getting

along with her coworkers. But it does not show that severe or pervasive race- or sex-based harassment was to blame.[18]

The grant of summary judgment on Carter's hostile work environment claim is supported by *Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009). *Barrett* involved allegations from Caucasian individuals that they were subjected to a hostile work environment and were retaliated against for their friendship with, and advocacy on behalf, their African-American colleagues. The Court addressed three specific allegations. First, Barrett had been called a "bitch" and was warned to "mind [her] own business." 556 F.3d at 517. The Court found that this was direct harassment, because it was based on Barrett's advocacy. *Id.* Second, Barrett alleged that her supervisor "directed desirable work away from [her] because of [her] friendship with [an African-American colleague]." *Id.* The Court noted the seriousness of this allegation, but found no evidence to support it, "other than [Barrett's] own impression that [her supervisor] directed desirable work away from her." *Id.* Finally, Barrett claimed that she "received the 'cold shoulder' from three Caucasian employees when she worked on the assembly line and that her group leader would ignore her requests for materials she needed in the course of her work because she was friendly with African-American employees." *Id.* The Court found that, while this conduct could *contribute* to a finding of a hostile work environment, "it is not, on its own, objectively severe conduct." *Id.* The Court concluded that the offensive comment, the perceived diversion of desirable work, and the receipt of the "cold shoulder" from a few co-workers was "insufficient evidence of severe or pervasive harassment

---

[18] TMMK made clear to Carter that if she wanted to have a meaningful relationship with coworkers, she needed to try and fit in. [Record No. 32-3 at 140 (H.R. Report of Tiffany Lance)] In like manner, Title VII is not meant to be a general code of civility.

to allow a reasonable jury to find that Barrett was subjected to a hostile work environment." *Id.* at 518.

The *Barrett* Court affirmed the grant of summary judgment against Barrett and her co-plaintiff Melton, for whom the Court also found insufficient evidence to support a hostile work environment claim. 556 F.3d at 520. However, the Court reversed and remanded the grant of summary judgment against their co-plaintiff Nickens. *Id.* Unlike the others, Nickens was physically threatened for reporting racist language. *Id.* at 519. Moreover, her co-worker as well as her supervisor "frequently made racially derogatory comments criticizing her association with [an African-American co-worker]." *Id.* When Nickens complained to her supervisor about these comments, he refused to take any action. *Id.* Finally, Nickens alleged two instances in which a supervisor and co-worker "attempted to prevent her from applying for job advancements because of their disapproval of her friendship with [an African-American co-worker]." *Id.* The Court found that Nickens alleged facts sufficient for a finding of liability because she "reported nearly all of the relevant incidents involving co-worker harassment to one of two supervisors . . . and they failed to take corrective action." *Id.* at 519-20. Further, Nickens alleged that both of the supervisors harassed her directly. *Id.*

*Barrett's* reasoning is highly informative here. Unfounded speculation about being assigned to less favorable tasks, coupled with "cold" treatment by co-workers and non-pervasive or severe comments are not enough. However, when physically threatened, or with sufficient evidence that supervisors failed to take action to prevent frequent harassment, partook in the frequent harassment themselves, and attempted to prevent a job advancement

because of the employee's engaging in protected conduct, such allegations are sufficient for a finding in the plaintiff's favor and must be sent to the jury.

The only similarity between Carter and Nickens is Carter's allegation that a supervisor was responsible for some of the derogatory comments against her. However, whereas Nickens' supervisor made racially derogatory comments to her, Carter's supervisor merely told her to "toughen up." "Toughen up," together with the suggestion that Cooley encouraged another employee to tell Carter "to stop harassing her," are not severe or pervasive enough for a finding of a hostile workplace, especially on the record that shows Cooley recommended Carter for a team leader role, reminded her to attend orientation,[19] and in which Carter admitted that all was well with her relationship with Cooley.[20] Moreover, the record is very clear that Carter's employer did not tolerate objectively offensive comments, and quickly and routinely investigated and took corrective action as necessary. "[A]n employer can escape liability (from actionable discrimination) only if it took reasonable care to *prevent and correct* any sexually harassing behavior." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999). TMMK documents its reasonable care, and Carter has no showing to the contrary.

---

[19] "It is uncontroverted Cooley actually encouraged Carter to pursue a Team Leader position. He completed the necessary paperwork for her to proceed in the process, advised her of the timing of the next Team Leader orientation, and thereafter reminded her to attend the orientation." [Record No. 32-1 at 14]

[20] "I went back to Tamika a few weeks later and asked her if she was doing okay and to let her know that I addressed the situation with Sean. Tamika stated to me that Sean did apologize to her and that things were going well. I told her to let me know if she has any more issues." [Record No. 32-2 at 1333 (H.R. Report of Tiffany Lance)]

In conclusion, while the Court assumes that Carter has met the first, second, and third prongs of the hostile work environment test (protected class, unwelcome harassment, based on protected status), Carter has failed to show the fourth and fifth prongs. The comments alleged are not sufficiently extreme to constitute a changes in the terms and conditions of employment. And even if so, TMMK has undertaken reasonable steps to prevent and correct harassing conduct. Carter does not allege that TMMK was complicit, and Carter's supervisor's actions (coupled with TMMK's response) do not create liability.

### d. Retaliation Claim

"To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).

"A plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "A materially adverse employment action in the retaliation context consists of any action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

Importantly, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 68. "[A] plaintiff

must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quotation marks omitted)).  For example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch *that contributes significantly to the employee's professional advancement* might well deter a reasonable employee from complaining about discrimination.  *Burlington Northern*, 548 U.S. at 69 (emphasis added).  "[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.  By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id.* at 69-70

Finally, plaintiffs must show a causal relationship between their protected activity and the adverse actions.  "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action."  *Barrett*, 556 F.3d at 516-17 (internal citations omitted).  The employer may, in response to a charge of

retaliation by a supervisor, "assert the same affirmative defense that is available to hostile work environment claims."[21] *Id.*

The plaintiff repeats her previous allegations of disparate treatment and hostile work environment wholly and summarily as the basis for her retaliation claim. [*See* Record No. 36 at 10-11] She complains of being denied offline training, being denied overtime, and being required to perform more defect countermeasure forms. These claims, if substantiated (and shown to have a temporal connection), would likely meet the retaliation standard because the acts are meaningful enough "to dissuade employees from complaining or assisting in complaints about discrimination." However, as previously discussed, Carter has put forth no competent evidence to support those claims.[22] Retaliation based on complaints to Human Resources are alone actionable, but it is notable that the only specifically allegation to occur *after* the EEOC charge was filed is a single overtime incident (one might expect *more* retaliation after a formal charge is filed).

Carter has not shown that she was wrongly denied offline training, or that it was temporally-connected to her complaints to H.R. or to the EEOC. The record establishes that Carter did receive offline training, just not the first time she requested it. [*See* Record No. 36-1 at 17 (Carter deposition at 194)] Moreover, TMMK provided a good reason why she was

---

[21]     The burden-shifting framework applies to retaliation claims. *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000).

[22]     Whether the parts-loading assignment would be material for retaliation purposes is an open question, but again, it is unsupported by any evidence. Carter's allegation that her hiring packet was held cannot be considered retaliation because there is no evidence of complaints made prior to Carter being hired by TMMK.

initially denied it, and Carter has not suggested that the reason is pretextual. [Record No. 36-2 at 2 (Cooley deposition at 27-28)]

Carter has provided no competent proof showing that she was improperly denied overtime, much less in retaliation for protected activity. Carter alleges that on October 20, 2015, Cooley advertised that 5S cleaning was available, but left before Carter could get more information from him. [Record No. 36 at 6] As discussed above, Carter does not allege that Cooley intentionally avoided her or had some duty to discuss the overtime opportunity with her specifically before he left for the day. It is not clear that Carter could not check with another supervisor to determine where the work was to be completed, or could not have contacted Cooley despite his departure. Without some evidence to support that other employees actually worked overtime on this occasion when Carter did not (which should be readily available through discovery), there is insufficient evidence for a jury finding.

Regarding defect countermeasure forms, there is testimony to suggest that more CM forms may entitle someone to less offline training, and so impact ones potential for job advancement. There is little doubt that exacerbating a single employee's flaws, to the potential detriment of job advancement, may count as retaliation. But there is not a shred of evidence that Carter was actually made to fill out more CM forms. The specific incident that Carter references involves both her *and* Amy Simon, a Caucasian female, being "singled-out" for defect CM forms. Because there is no evidence that Amy Simon made complaints to H.R., her receiving the identical treatment as Carter undercuts this claim of retaliation. Carter provides no other specific instances of unfair defect CM form treatment.

Having disposed of the non-verbal employment actions alleged as retaliation, what remain are the "H.R. queen" comments, warnings to new employees to be careful around Carter, and Cooley's alleged encouragement to Amy Simon to yell "stop harassing me."[23]

Carter alleges that after she "made complaints to Toyota's Human Resources Department and filed a Charge of Discrimination, her supervisors and co-workers began to refer to Carter as the 'HR queen.'" [Record No. 36 at 3 (citing Carter deposition at 113-14)]. Calling someone an "H.R. queen" is undoubtedly of the nature of retaliation—it is in response to the individual's complaints to the human resources department. It is not, however, actionable on its own. Complaints that form the basis for retaliation must have been "reasonable and based on a good-faith belief that [TMMK] was acting in violation of Title VII." *Barrett*, 556 F.3d at 516. For example, if Carter were being mocked as an "H.R. queen" for complaining to the Human Resources department about non-actionable petty slights, such as someone else bringing in macaroni and cheese to the employee potluck, that retaliation would not be actionable because it was not in response to protected activity. It is not clear what actions, protected or not, supposedly led Carter to be called an "H.R. queen." Therefore, the Court will not question the good-faith nature of Carter's complaints. Instead, this claim

_____

[23] While Carter argues that she was subjected to retaliation by "adverse employment action when she was consistently subjected to unwelcome harassment on the basis of her race and gender" she does not elaborate which of the alleged instances of race and gender discrimination are temporally connected to her complaints to H.R. or her filing of the charge with the EEOC. Retaliation claims have a lower standard than the substantive offense, but the alleged comments by non-supervisors need not be re-addressed in detail because the record is clear that TMMK fully investigated those comments and took disciplinary action where necessary. Comments by co-workers not tolerated by an employer are not actionable retaliation. Retaliation requires an adverse action of the employer, or at least employer inaction in the face of employee misconduct.

fails because TMMK did not encourage, tolerate, or permit these comments, and the comments were not made by a supervisor (assuming they were in fact made).

Next, Carter's complaint that "co-workers would warn current and new employees to not say anything to her or around her because she would go to the Human Resources department" is not sufficiently severe to amount to retaliation. [Record No. 36 at 3 (citing Carter deposition at 156)] As the Supreme Court has made clear (while simultaneously lowering the bar for retaliation claims), "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68. Receiving the "cold shoulder" is the likely result of such actions, and it is not sufficient for retaliation. *See Barrett*, 556 F.3d at 518. Again, it is not alleged that TMMK tolerated these action by Carter's co-workers.

Finally, there is nothing in the record to support the claim that Cooley "concocted a plan to get Carter in trouble by telling one of Carter's co-worker's to yell 'stop harassing me' to Carter." [Record No. 36 at 3 (citing Carter deposition at 155-56)] Carter presents no affidavit or deposition from Amy Simon to support that she was told to act this way, and TMMK fully investigated this incident (which allegedly happened in 2013) and found it unsubstantiated. [Record No. 32-3 at 143-46]

Assuming that Carter's complaints to the Human Resources department and the EEOC were made in good faith, TMMK is not liable for the supposed retaliation. TMMK has shown reasonable steps to prevent such comments and has disciplined employees for making them. Carter does not allege that TMMK has permitted her co-workers to persist in calling her an

"H.R. queen," or any of the other listed comments that Carter found offensive. Corrective action has been taken against her supervisor for his "toughen-up" comment, and against other co-workers for violating TMMK's policies. While Carter is unhappy with the actions of her co-workers, she has not shown a failure of her employer to act appropriately in response. Because Carter has not shown that TMMK took adverse employment action against her, or subjected her to severe or pervasive retaliatory harassment based on her protected activity, there is no genuine issue for a jury.

### III.    Conclusion

Taken as a whole and in context, petty insults or slights may be material where linked to more pervasive or substantial acts. *See, e.g., Williams v. CSX Transp. Co*., 643 F.3d 502, 514-16 (6th Cir. 2011) (White, J., dissenting) (the plaintiff's demeaning job assignments (such as cleaning feces off of a wall) while alone not actionable, were in the dissent's view, material when taken together with the highly offensive comments); *William v. General Motors*, 187 F.3d 553, 562 (6th Cir. 1999) (it is improper to "divide[] and categorize[] the reported incidents" which "divorc[es] them from their context and depriv[es] them of their full force"). But Carter presents no evidence of "more substantial acts," and TMMK took reasonable care to both prevent and correct offensive comments (no matter how petty) and to ensure proper enactment of its training, defect countermeasure, and overtime procedures.

The record reflects Carter's frustration with her workplace. Carter felt slighted and perhaps grew frustrated with her inability to garner the respect of her co-workers. [*See, e.g.,* Record No. 32-3 at 140 (H.R. Report of Tiffany Lance)] But Title VII and the KCRA are not meant to police general workplace civility. The law is meant to stamp out discrimination and

harassment.    Carter provides insufficient evidence to hold TMMK liable for either. Accordingly, it is hereby

**ORDERED** as follows:

1.    Defendant Toyota Motor Manufacturing, Kentucky, Inc.'s Motion for Summary Judgment [Record No. 32] is **GRANTED**.

2.    A separate judgment will issue.

This 15th day of May, 2017.

Signed By:

*Danny C. Reeves*    DCR

**United States District Judge**